Good morning, Your Honors. My name is Roger Flynn, Counsel for the Te-Moak Tribe of Western Shoshone of Nevada, and the other plaintiffs with me is Jeffrey Parsons, my co-counsel. This case involves a number of statutes and regulations dealing with management of public lands and how the federal government treats its federally recognized Native American tribes, such as the Te-Moak Tribe here. But I think the main issue that cuts across the case for all these statutes, the National Environmental Policy Act, the NEPA, the National Historic Preservation Act, NHPA, or FLIPMA, the Federal Land Policy and Management Act, is the failure of the BLM to fully involve the public and particularly the Te-Moak Tribe here in its decisions affecting very important public land resources and particularly the religious and cultural practices of the Te-Moak Tribe that have been going on in this area for countless generations. Before I get into the legal arguments, I just wanted to set the stage for the case and this project. The project is a large-scale gold exploration project spread out in three phases over about five years. It involved about 375 drill sites, numerous new road construction onto public land, and it would take place in the area around Mount Denebo, which is one of the sacred mountains and a very important religious and cultural area for all Western Shoshone across Nevada. There have been some, as the record shows, other mining and exploration in the area going back to the 1800s, but the issue is BLM's responsibilities to the public and to the Te-Moak Tribe and the Western Shoshone members of one of the other plaintiffs, particularly the Western Shoshone Defense Project, which is a non-profit group. In this case, the BLM approved all three phases of the project in one decision with one environmental assessment. It did not do the larger environmental impact statement. One of the critical issues here is for all of these drill sites, hundreds of drill sites and miles of road construction, despite the repeated request by the plaintiffs to the BLM office in Nevada for the location of just one of the drill sites, just one of the roads, let alone 375, the BLM said, no, we do not have that information, and in fact, we're not going to require that of Cortez, which is a subsidiary of Barrett Gold Corporation, the world's largest gold corporation. We are not even going to ask that information of the mining company until we approve the project. As you read from the briefs from the other side, they're arguing, well, you should have told us more about why you're concerned about the drill rigs and the roads and stuff, and well, we asked the BLM, where are these drill sites going to go? Where are the roads going to go? And as BLM said in their brief about pages 8 and 9, they said, well, it's going to go, they're going to go somewhere within the large, the project area is 30,000, over 30,000 acres. That's about 50 square miles, give or take. So somewhere in that 50 square miles, we're going to see these hundreds of drill sites and roads going in. The actual footprint, as we call it in the mining lingo, is only about 200 acres, but drill sites are very concentrated. The damage is concentrated, the impact of people trying to pray or conduct religious ceremonies just even, you know, a few hundred yards away can be very extensive. Imagine being in a church and there was a drill site at the back of the church. It would be disruptive. So even though the footprint is only 200 acres, we're talking about a very significant impact to the religious uses of the land. As I mentioned, the Mount Donabo area and also the Horse Canyon area, which is on the east side of Mount Donobo, has been recognized by BLM itself and has been designated as what's known as a PCRI, which is a nationally recognized property of cultural and religious importance. And these PCRIs are pretty much in the middle of this 50 square mile project area. And that's a concentration of Western Shoshone religious and other uses. And those PCRIs were designated on a landscape basis. This isn't, you know, like an individual grave site or a stone tool gathering site or a fireplace from hundreds of years or something like that. These are landscaped issues. So it's a little different when we're talking about, you know, Lincoln's boyhood home or something like that as a historic, nationally historic property. This is a landscape level covering large portions of all of Mount Donobo and then in the back Horse Canyon area. So we have some of these very large landscaped areas that will be intruded on by these drill sites and roads. And so that's sort of the setting for the case. And I wanted to get into some of the legal arguments here. I want to talk first about the National Environmental Policy Act and particularly the duty under NEPA for the agency to review all cumulative impacts. And what we have here, the primary argument from plaintiffs on the cumulative failure of the BLM to do cumulative impacts analysis is the fact that in the same project area, within the same project boundary, Barrick has proposed one of the world's largest gold mines, open pit gold mines approaching 7,000 acres. It's known as the Cortez Hills or Pediment Project. And that was admitted by BLM to be a reasonably foreseeable action when they approved the exploration project. And there's scant mention of it in the environmental assessment. Now one of the problems with cumulative impacts analysis, I think, goes to what really is unfortunately the BLM's practice in Nevada, is when there's other mining projects nearby, they have a table, as they did here, a table of other mining projects. They list the acreages of these other incoming mining projects and they give a short description of the facilities. They'll have this huge open pit, hundreds of feet high waste piles, maybe we're going to have cyanide heap leaching facilities, very destructive use of public land. And that's about it for the description of the Cortez Hills Project, which is a reasonably foreseeable action, which is the test for cumulative impacts under NEPA. And I think, Judge Thomas, with great respect, that the case I argued before your panel a Great Basin Mine Watch versus Hankins case, the Ninth Circuit unanimously held that the BLM's practice in Nevada of just listing the acreages and giving a very qualitative cursory description of project facilities of nearby mining fails NEPA's cumulative impacts requirements. I think that is a very well-reasoned decision. And we feel that that is the controlling case here and is very similar to what BLM did in that case. Does it make a difference that they did an EA here instead of the EIS? Well, EAs are often viewed as, in the vernacular, as mini EISs. And so the requirements for cumulative impacts, analysis of baseline conditions, alternatives, we have an argument about alternatives, apply equally, we think, the Klamath-Siskiyou case and some of these other cases that we cited. The EIS requirements apply maybe at a slightly reduced level, but they certainly are required at the EA stage. The Ninth Circuit has squarely held that the duty to do cumulative impacts analysis under NEPA is not excused just because you're doing an EA. And this is a case where the Cortez Hills project is right in the same area. Sometimes you'll have EA cases or EIS cases where the project that the environmental plaintiffs or the tribal plaintiffs are complaining about is a project that hasn't been proposed yet. It's often the case. I might have lost a case like that about 10 or 15 years ago. But this one is not that case. This mine was proposed and it is admitted by BLM to be a reasonably foreseeable project, and that's the test for NEPA. Now, BLM argues that, well, there's no cumulative impact between five years of exploration in the same area as then a new 10-plus year huge open pit mine. And put yourselves in the shoes of someone trying to conduct a private religious ceremony in this area. For five years, they've had bulldozers and drill rigs coming in. That exploration ends, and then all of a sudden comes this new mine in the same area. I think that is certainly almost by definition a cumulative impact on that person's religious views, as well as just regular public land, recreation, wildlife, and other environmental impacts. This case isn't just about the impact on Western Shoshone religious uses. So I think to argue that there's no cumulative impact from a 7,000 acre open pit mine that would follow on the heels of five years of drilling and road construction, I think is really just nonsensical and certainly is not supported by the record, which is the court's task today is to look at the administrative record. Again, I think the Great Basin Mine Watch case requires detailed quantitative analysis of the impacts on these reasonably foreseeable actions. I think controls and that quantitative analysis here is missing. There's no discussion. One of the other critical failures under NEPA, as I mentioned in the introduction, is these 375 drill sites and all these roads. We have no idea where they're going to go. Certainly we didn't know when the project was approved, and that's when the record closes and judicial review is focused on. So we think it's fundamental under NEPA for the public to have the information. In fact, the agency, we think, has an obligation to know where these drill sites are going to go. And that's underneath the consultation duties on a government-to-government level under the NHPA is an even tougher and what's called a higher standard that the agency has to do. And if you read some of the briefs and the record, the government says, well, the Timok tribe and the other Western Shoshones didn't tell us what was wrong with this project. They didn't volunteer any more specific information because we had looked at these areas before. There was some 50 acres of exploration that was approved in 2001. There was mining in the area. It started back in the 90s. Were the initial 50 acres, were they identified? Not at that time, no. Where the sites were going to be? Yeah. I'm not sure where they are, where they ended up. But they weren't identified at the outset there either, I gather. Yeah. And I'm not 100 percent sure, but from my knowledge, I don't think back in 2001 they told us where those were going to go either. I think you're starting to see a pattern here from BLM and Nevada. Let me ask you, is there something unique about the fact that this was an exploratory project? Well, the way mining works is you have exploration goes in. They try to find where the ore body is, where the gold or the copper is going to be. And then once they get the results back, then they decide whether to build, propose a big new mine. And in this case, they had already had enough knowledge to propose the Cortez Hills project at the same time while they were going for further exploration in the area. So they had 50 acres. They had the Cortez Hills project. That's fine. That's all recognized. But I'm just curious if there's something about the methodology of this exploration that they're not really able to identify exactly where they're going to be drilling. Well, that's a good point. They raised that in their briefs. But when you actually pry that argument open, what they're saying is, well, we don't know where all the real, the heart of the gold ore body is. But in this case, right after the public review was terminated, right after the consultation was terminated, they approved the project. It's approved. You can go out somewhere in that 30,000 acres. Then Cortez submits its maps and its detailed analysis where it's at least the phase one is going to go. So we feel, wait a minute, if Cortez can provide those maps and details right after the project is approved and the public review is terminated and tribal consultation is terminated, why couldn't they have done that six months earlier? Now, I know corporations, it takes a while. Your geophysicist and your scientist are trying to figure all that out. But certainly that could have been done earlier. There's really no reason. Where maybe phase two and three may be going, I think, in fairness to the company, we don't know exactly where that's going to go. A lot of that is hinged off of phase one. But we have not a single shred of information as to where the drill sites and the roads are going to go for phase one. So I think that's a fundamental project there. And again, BLM approved all three phases at one. At once, one of the things we argued is they should have done a phased analysis so we could have looked at the information from that first phase and moved on. There's also this issue with the BLM regulations, its mining regulations under FLIPMA, the Federal Land Policy Management Act, the 43 CFR part 38 on performance standards, which require BLM to put in a detailed maps of where your access roads are going. Where are these drill sites going to go when you submit your plan? Cortez didn't do that. And I think that fundamentally cuts off both BLM's analysis as well as the public's and the tribe's. BLM's answer on the requirement to have detailed maps of the access routes is, well, we gave you the location of the state highways leading to the area. They might as well have just said interstate 80. That doesn't tell us where they're going to go on public lands. Saying that they'll drive along state highways and then hit public land and then the map becomes blank we think violates not only NEPA and the NHPA, but the FLIPMA performance regulations. As we pointed out, BLM has a duty under its performance standards to protect cultural resources. And part of doing that is involving tribes and involving the public to analyze and give feedback on where these specific projects are going. I think one of the most egregious examples or problems in this case is the NHPA, the consultation duties. The project was proposed in July of 2003. Within a month, they're talking with, BLM is talking and working with the state of Nevada. We cited in the excerpt of the project, it wasn't until a full year later, at the very end of July of 2004, where the first consultation letter says, we are hereby initiating consultation with the Tumok tribe, a letter from BLM to the Tumok tribe. And that's in late July of 2004. The environmental assessment comes out the first day of September of 2004. And the BLM is accusing the Tumok tribe of not submitting information fairly. I think the NHPA regulations at the 36 CFR Part 800, the BLM's own policies on consultation with tribes, specifically say consultation has to be done as early as possible. Even before, BLM's handbook says, even before you deal with state agencies. That obviously did not happen here. How do you respond to the argument that they had done all these ethnographic studies in 2000? The previous studies. Earlier, yes. Right. A couple of things with the studies. First That they tiered to those. Right. Why? Because tiering is allowed. They specifically said, we're, you know, incorporate all that stuff. Right. So how do you respond to that? There's a number of problems with the BLM's reliance on these previous studies. One was a lot of them were done in the 1990s, well before these projects were ever even considered. The second one, none of them mentioned the Cortez Hills project and this huge new mine coming in right in the same area. Or the Cortez Underground project, which was proposed when the state director had issued his decision. None of them particularly consider the properties of cultural and religious importance. The PCRI that was designated in 04. In fact, if you just, if you look at our reply brief at page 15, we cite the two EISs in 2000 and 2004 that they rely on. And it quotes, those EISs say there were no traditional cultural properties in the area. And then later on in 04, the BLM officially designated, designates as a nationally important property of cultural and religious area, important activities in the same area. And none of these previous analysis had looked at this project. We think the Ninth Circuit's decision a couple of years ago in the Pitt River Tribe is incredibly on point here. It says that consultation on previous projects does not satisfy the lack of, or excuse, the lack of consultation on a new project. This was geothermal development in that case. So we think the Pitt River Tribe, which we cited in our reply brief, is right on point. I have one other question in this area. That is, I think the EA says that they recognize an ongoing obligation to do cultural assessments if it's brought to their attention, and to respond accordingly. Is that of any significance? Well, that is part of their argument on this exclusion zone protocol that they set up, notably six months after the project had been approved. We asked the BLM State Director in our appeal to the Administrative Director in Nevada, would you stay this project while you work with the tribe on some of this stuff, while you consider our appeal? Flatly rejected. Says, nope. The project continues. Then they come up with this exclusion zone protocol which says, we'll consult with you in the future. However, if you look at that consultation, it's actually by a single BLM employee, apparently, will be going, maybe there'll be a Native American observer undefined. We'll go out with the Cortez and determine if an individual drill site or a group of drill sites or roads will have an impact on religious and cultural issues. And we think that the federal court, in that Atakai versus BLM case, flatly rejected BLM's process for that, saying that a single BLM employee out there, that person will determine whether there'll be some zone. And it's not really an exclusion zone, it's really just a temporary stay while the BLM figures out what to do a little bit more. They're not bound by that anyway, are they? That Atakai case? No, no, no, no, no. They would not be bound if the tribal observer, so to speak, took one position and their person took another position. They could just ignore that. Well, we think that there's a duty to protect cultural resources, but the BLM's practice in the past out there is to say, thank you, but we're going to allow the project to go forward. One of the interesting things about this exclusion zone, this temporary stay zone, as I like to call it, is it was done without any consultation. If you look at the regulations that when they make this no effect determination on what would happen on these projects, they have to consult with the State Historic Preservation Office and the tribe under the part 800 regulations, and that was not done here. They consulted with the State Historic Preservation Office when they issued the EA back in September of 04, but the exclusion zone protocol, the no effect decision, or whatever this BLM archeologist will determine as the project moves forward, that was all done without any, what they call the SHPO consultation or any consultation with the tribe. So we think, the last thing I want to say, because I want to save a little time for rebuttal as time runs out, the consultation process on some of these previous consultations, if you look at, for example, the Muckleshoot case that we cited from the Ninth Circuit, consultation involves two stages. The first stage is to determine whether there's properties of religious, historical, cultural importance out there. Most of the consultation was geared to that. The second stage is for individual projects that may be affecting those areas that had been found or designated to be these nationally important areas. So most of that consultation, the ethnographic reports, dealt with either old projects or to determine whether in the scope of the PCRI or the larger, what we call the traditional cultural property here, and those don't satisfy for this project. There was very little consultation in any of those cases. There was literally 11th hour, just before they, a month before they essentially signed the EA, they gave the tribe a belated attempted consultation. I'd like to conclude there, and with the Court's permission, I know I ran over on the 20 minutes, but if there was a little time for rebuttal, I'd request that. But thank you very much. Roberts. Thank you, counsel. Do you have a time allocation? Yes, Your Honor. We have allocated our time as 15 minutes for the Federal Government and 5 minutes for Cortez. Okay. Very good. The next seat. May it please the Court. My name is Donna Fitzgerald. I'm from the U.S. Department of Justice, and I represent the Bureau of Land Management in this appeal. Before I get into the legal arguments, I wanted to make one or two comments about the facts here and exactly what type of program this is, as I will be referring back to some of these factual elements as we discuss some of the legal issues here. It's important to keep in mind that this project that was approved by the Bureau is not a mining project. It's an exploratory drilling project, which is designed at defining the ore body underground. It's also an amendment to an earlier project that the Bureau of Land Management had approved in 2001. The earlier project authorized Cortez to disturb up to 50 acres of surface disturbance in a project area which was approximately 30,000 acres. Nobody challenged that particular project. These plaintiffs here did not raise any issue with that project, and it went forward, and it is now completed. Cortez came back to BLM and asked for an amendment to that 2001 authorization so that Cortez could then disturb an additional 200 acres of surface disturbance in the same 30,000 acre project area. The agency engaged in an environmental assessment that was based not only on the analysis that the agency did in the 2004 timeframe, but also referred back to the analysis and the information that the agency had based on its 2001 analysis in its time. As the record here reflects, the agency also had a multitude of information with respect to impacts on cultural resources. The agency had done years of interviews and site visits with tribes in the area. We have ethnographic studies on the record, and these are studies dated not only from the 1990s, but in particular there were two from the year 2000 and another ethnographic report from the year 2004, which the agency relied upon to ultimately determine in the year 2004 that there were properties of cultural and religious importance in the area. The agency used the information it had collected over a period of years to actually designate those two areas as PCRIs. Those are defined and explained in our briefs as NEPA and PCRI. The information that the agency had collected over the years and that the agency relied upon in doing its NEPA analysis here also included archeological surveys. This project area has been studied at the Class I and Class II level in its entirety, and 43% of the project area has been studied at the Class III survey. So the agency does have information and relied on that information with respect to archeological and cultural resources in this project area. It's also important to keep in mind that with respect to this project, Cortez is authorized to disturb only 50 acres at one time. After that 50 acres is disturbed, Cortez is required to reclaim it, and then it can move on to another parcel. Also, at the end of this exploratory drilling program, Cortez is required to reclaim the entire area. Again, this is not a mining program. Based on the analysis that the agency engaged in in its EA, which again included the analysis and information that the agency had collected over the prior years, the agency determined that there would be no significant impact to any of the resources that had been identified by the tribe and by the other plaintiffs here. In particular, the agency's EA and FONSI imposes mitigation measures, mitigation measures that were designed to avoid impacts to cultural resources in the project area as well as to other resources such as riparian areas and nesting birds. Contrary to Mr. Flynn's argument this morning, it is the agency's finding of no significant impact that includes the no effect determination under the NHPA. That's that excerpt of Record 277 where the agency clearly stated there would be no effect to cultural resources. What happened here was ... I'm sorry to interrupt you. Since we only have limited time, can you get right to the of the degree of consultation that took place with the tribe prior to this approval? Because that is the crux of opposing counsel's argument. He basically says there was no consultation until after the fact, belatedly, and then in a way that essentially made it pretextual almost. Well, we don't agree that the consultation was pretextual. I understand that, but what I want to know is why. Well, the reason primarily, Your Honor, is because of the multitude of studies and consultation that had happened in the prior years with the tribes in the area. The dates on the letters and the dates as they have rolled out in terms of when the agency approached the tribe about the amendment project is true. They approached the tribe in 2004, which was approximately a year after Cortez had submitted its plan, its proposed plan. But as is clear from the record, the agency had years' worth of data in its file. Why is there a letter under Pitt River? Well, in Pitt River, the court found that the prior consultation ... Well, my understanding of the Pitt River Ninth Circuit, excuse me, opinion was that the court found there had been no prior consultation and that what the agency had done that was problematic was actually extend leases and that there had been no consultation on lease extensions. That's not the case here. This is an amendment to an exploratory drilling program that simply authorized Cortez to disturb another 200 acres of surface disturbance. Right, but why do you think you can rely purely on past consultation when an amendment is required and an environmental assessment takes place? Obviously, from climate, you need a analysis of various factors and environmental ... I understand your argument that you had a body of evidence and studies that were done well and can inform your decision, but what excuses the failure to consult specifically on the amendment? Well, two things. One, the agency did engage in consultation on this amendment. It's not as if they just issued its decision without re-initiating consultation. The tribe's concern is that it came too late, but the agency did approach the tribe with a letter in July of 2004 and followed up with phone calls in September of 2004, which are in the record here asking the tribes if they had any additional information to supply with respect to the amended program. The BLM did not hear from the tribe and it wasn't until January of 2005 after the FONSI had been signed that the tribe and the state director met and a conversation was held with respect to resources and impacts, and then the state director issued his decision in April of that year, which added an additional layer of protection in the form of exclusion zones. But it's not as if the BLM simply issued its decision relying entirely on the past consultation. They gave the tribe the opportunity to ... It wasn't fairly late in the game. It wasn't as though the amendment was sent to the tribe immediately or the proposed amendment saying, we have this proposed amendment, will you comment? It wasn't sent at the time that the amendment came in, but it was sent a few months before the EA and the FONSI were signed, and the tribe had at least two or three months to come in and say, well, based on the amendment, we think that there's some new resource of concern. They have never done that. Had a draft EA been prepared before the tribe was consulted? I'm not sure about that, Your Honor. I don't have an answer to that. The logical conclusion is probably so. The way these things work in an agency, things take time and they go through numerous drafts, and it would seem logical that probably a draft EA had been prepared before the tribe was consulted. But I gather that's not in the record. I don't think it is, Your Honor, and I don't recall speaking about that or briefing that issue. With respect to the consultation, again, it's our view that the consultation that was done in the past obviously informs the agency's decision-making here because it's related to the same type of project. It's a project, an exploratory drilling project. The operational details are the same as the ones that were approved in 2001. BLM knew what type of access roads Cortez was going to require. They knew what type of drill pads Cortez was going to use. And it's not accurate for Mr. Flynn to characterize this as a project that has 375 active drill rigs at one time. As the Cortez briefs explain, this is a phased project where you have a small number of drill rigs on-site at any one time. And my recollection is Cortez's brief makes reference to an average of six drill rigs at one time. Again, this is to be done in phases. So this is not going to be an exploratory drilling program where all drill rigs are out on-site all at one time. They're drilling kind of mini-mines, so I mean, these are not a couple of guys going out there with a burrow and a pick and shovel. I mean, these are substantial installations because they're trying to determine whether there are mineable veins of gold worthwhile, not just little flecks of gold here and there. I mean, it's got to be economically feasible for them to go after it. So these are not insignificant installations. That's correct, Your Honor. They are defining an ore body, but it's not as if there are 375 drill rigs out on-site at one time. And this is a project... They're not popping all over the place, though. They go here and then they go someplace else and then they come back over here and over there. Well, they do, but Cortez is also... Nobody really knows because you basically have given them carte blanche within a certain area to go wherever they feel like they need to go. Well, Your Honor, Cortez is required to reclaim the work that it does in a particular area and this entire project area will be reclaimed. The exploratory drilling program does require reclamation in its entirety from Cortez. And as far as the agency... I understand that, but reclamation does not obviate the need for consultation. I mean, you certainly are not arguing that. No, we're not, Your Honor. But what we're arguing is that the consultation was adequate under the NHPA statute. Well, I understand that, but the fact that you keep mentioning reclamation and reclamation is something that goes on after the fact and one wonders. I mean, there's a lot of argument about how good reclamation is in terms of restoring a site to its original condition. And this is particularly troublesome when you're dealing with Native American tribes and you're dealing with the sacred nature of their religion and even the disturbance of a religious area in the first place, regardless of whether it's reclaimed at a later time, provides an insult to their religion. So I think these are things that have to be considered ahead of time, not after the fact. Well, Your Honor, the agency did consider the Native American resources. The environmental assessment here contains a chapter... But to follow up on Judge Ezra's point, the point of meaningful consultation is to avoid these kinds of problems because you'd say, all right, we're going to, here are the areas, here's our plan for drilling, here are the areas we want to drill, and then the tribe or the landowner or the affected parties in the respective cases can say, well, no, we think it can be phased in in a different way or we object to this particular drill site because it can be very disruptive. And depending on the siting, it may not pose a problem and may pose a serious problem. But if you don't consult, you don't know. And the argument was made at Believe in Muckleshoot that, well, we picked up the phone and called them and got a response, but by that time the plans were out. There was not any meaningful consultation. And although I haven't formed an opinion yet on this case, it would appear that that's the case here, that it was a perfunctory call made after someone said, oh, by the way, we better consult, and everything was drafted. Well, we would disagree, Your Honor. The agency is relying not only on the dialogue it had with the tribe after the amendment was prepared and submitted by Cortez and after the FONSI, or during the EA and FONSI process, but again also the previous years of dialogue with the tribes that resulted in the agency determining that there were two areas out there of cultural and religious importance. And those are the areas that, under the NHPA, the agency needs to consider effects to. It's not as if the entire project area is a spiritual area or, as Mr. Flynn has characterized it, as the tribe's church. There are particular areas of concern that the agency identified based on years of consultation in ethnographic studies. And as the record reflects here, the agency is fully intending to protect those features. The protocol that Cortez must follow when engaging in the exploratory drilling program here requires Cortez to submit a map at one to, I believe it's 48,000 detail, and that is before Cortez engages in any surface disturbance at all in the project area. BLM will then look at that map and determine if it has a Class 3 survey on file for that map, for that area. If it does, BLM will compare what's in the area based on the survey and determine if anything is expected to be impacted. If BLM does not have a survey on file, Cortez is required to actually get a survey done. And at that point, the agency will know if any cultural resources are likely to be impacted. If they are, an exclusion zone protocol will be established. But at the agency's discretion, at that point, without consultation of the tribe, there's no need to consult at that point, is there? Well, the state director's decision says that if... But I don't think there's any legal requirement. Right, that's correct, Your Honor. The state director's decision, the agency may... So how is the tribe supposed to meaningfully consult on a proposed drill site they don't know about? Well, the exclusion zone protocol anticipates that a Native American observer will be part of this process. And it's true that there's no absolute guarantee that Cortez will not be allowed to go into this zone after it's analyzed. But BLM is expected to comply with all of the laws that govern it. And I think BLM should be afforded that deference here. I see your time is running down. You want to cede time to the other side, or to your co-defendant, I guess. But let me ask you a question. You didn't really have time to address the cumulative impact argument that counsel made, but maybe you could just respond to me very briefly. How does the cumulative analysis here in the EA satisfy the standards that we set forth in Great Basin Mine Watch and Siskiyou? We think it does on a number of points, Your Honor. Well, Your Honor, we don't think it's thin. And the reason is the reason that we presented to Judge Hicks, and I think resonated with him when he ruled in our favor. And that is what the agency determined is that the impacts from this exploratory drilling program are not going to be cumulative or incremental with any other impacts from the reasonably foreseeable activities that the tribe has identified, such as the Pediment Cortez Hills project. The agency analyzed the impacts, the likely impacts from the exploratory drilling program on a number of resources, including cultural and Native American resources. Based on that analysis, as well as the mitigation measures that the agency imposed in its finding of no significant impact, as well as the protocol that the agency later imposed through the State Director's decision, the agency determined that there would not be significant impacts to cultural resources or Native American resources. And I think it's an important point that in the briefing of this case at the district court level as well as here, the tribe has not come in and pointed to any one particular impact that this exploratory drilling program is going to have cumulative with other reasonably foreseeable actions in the area. They've referred to the Pediment Cortez Hills project, but that's a project that has been analyzed separately under an EIS. There are no impacts Isn't it within the same 300,000 acres or whatever it is? There is some overlap. 35,000 acres? Yes, Your Honor. The Pediment Cortez Hills project is within a smaller subsection. And it's identified as It is, Your Honor. a potential project that would have a cumulative impact. Well, it's Or effect. The agency identified it as a reasonably foreseeable future activity, but the agency did not identify it as an activity that would have cumulative effects incremental to the effects from the It's like they had to look at it to determine whether or not there would be cumulative effect. Well, and it's our position, Your Honor, that the agency did look at the reasonably foreseeable future actions that had been identified by the tribe. And those were identified in our brief. And the  In the EA, the agency referred to the Pediment Cortez Hills project in a chart which identifies the surface acreage disturbance. That's just this chart, right? That's right, Your Honor. Okay. Isn't that the problem, though? I mean, we had the same issue, I think, in Muckleshoot. We had the same issue in Earth Island, where a reference was made to a project, but no statement of analysis. I know sometimes it's all in the heads of the BLM or whoever is analyzing it. They don't put it on paper, but it's difficult to see what cumulative analysis was really done. Well, Your Honor, this And aside from a cursory statement, no cumulative impacts are expected. Well I mean, maybe you can point me someplace different than the record. I don't want to give you a full-time answer, but it just doesn't seem like there's the analysis in the EA about a reason for the conclusion sufficient for us to review it. The documents that I can point the Court to are the same ones that we cited to in the brief. It's the EA as well as the original EA, and then the State Director's decision referred to NEPA analyses for other mining projects in the area, which made reference to the Pediment Cortez Hills project, as well as, may I add, the underground exploration project and the geothermal project. But our main point, again, is just that the plaintiffs have not identified how these are, how the impacts from the exploratory drilling program are incremental with impacts from the other reasonably foreseeable future actions that they have identified in their brief. Your Honor, I know I'm low on time, but I just wanted to clarify for the Court, in our response brief, we cited two sections of our excerpts of record as supporting analysis of underground and geothermal, and I realized in preparing for this hearing that the page numbers were wrong. I just wanted to clarify for the Court. Just after the hearing, would you provide that to the clerk, and the clerk will distribute it to us so we all have the precise pages and references you want to correct. Thank you. Thank you, Your Honor. Thank you very much. We'll hear from Cortez, and we'll give you a full five minutes, not the second and a half that was remaining. We'll put five minutes on the clock. May it please the Court. My name is Robert Tuckman with Home Roberts and Owen here on behalf of Cortez Gold Mines. Let me go to one of the issues that Judge Ezra addressed, which is the consultation issue. The one is the test is one of reasonable opportunity to participate in consultation. Did the Timok have a reasonable opportunity to identify concerns about historic properties, advise on the identification and evaluation of historic properties, et cetera? The Timok tribe had that reasonable opportunity. Consultation in this area goes back to 1992 when Cortez proposed the expansion of the Cortez Gold Mine on the western side of Timok, on the western side of Mount Tanabo, and at that time there was extensive consultation that was undertaken, and that consultation is documented in the draft environmental impact statement, which is in the record for this case and shows the efforts that the BLM made at that time to consult with the tribes. Secondly, you've got consultation that went on on the Horse Canyon Project, and this consultation occurred in October of 1997. Recall that this project area divides into two pieces. One is the Cortez area on the west. One is the Horse Canyon area on the east. So you've got this consultation on the Horse Canyon area going back in October 1997. Nineteen letters are sent to the tribes. We're dealing with the same kind of exploration here. When you go back to 1997, we're not talking about anything different between then and what was going on for the project that was approved in October of 2004, with one exception, possibly, and that is that the mitigation measures had gotten stronger over time as opposed to weaker. But the point is you've got consultation going to the 1992 project. You've got consultation going to the project that was approved at the end of 1997 for the Horse Canyon area on the eastern side. Then you've got the consultation that goes on beginning in January of 2000 for this project area. The project that was approved back in August of 2001 and which was the subject of consultation between January of 2000 and August of 2001, the project area is exactly the same. The boundaries are the same. The exploration methods are the same. You've got the same identification in phases. And opportunities were given, 1992, 1997, 2000 through 2001. Tribes, tell us if there's anything out there that is of interest to you, that you are concerned may be harmful to you. Tell us. Tell us. So you've got years and years of consultation. And then going to the consultation that occurred in 2000, between 2000 and 2001, you've got multiple certified letters going to the tribes. Tell us what's of importance to you. You've got two ethnographic reports with site visits and interviews of the tribes. You've got BLM meeting with four western Shoshone tribal governments. Again, imploring the tribe and the bands, tell us if there's anything of significance, of importance to you. Tell us. BLM discusses the project at 12 monthly tribal environmental coordination meetings. BLM, and after all of that, the TMOC send a map showing a proposed TCP boundary. And based upon all that, in April of 2004, you've got the designation of the two PCRIs. And in addition, you've got the consultation that went on on the pediment project. The pediment project, the plan of operations had been submitted in January of 2001, and consultation went on for all of that, too. So the point is, by the time that you're getting to this project, which is an amendment, which is only an amendment to an ongoing exploration project, it's not something new. We're not dealing with a new activity in a new project area with unknown consequences on the environment. We're dealing with a continuation of exploration that has been going on in this area for over a decade, in this precise area, and where the tribes have been repeatedly given an opportunity to identify anything of significance to them. So when you come to the amendment, which is approved in October of 2004, what you've got is a situation where BLM sends a letter to the tribes on July 28, 2004, and says, you know, we're considering doing this. Do you have any concern? Do you have any problem with what we're doing? We're here to consult with you. The tribe, the Timo tribe, did not respond to that letter. The letter is sent, and they do not respond. September 1 comes around, and BLM sends out the environmental assessment. And to my knowledge, there was not a draft environmental assessment that was prepared in this circumstance. It was the environmental assessment goes out September 1. It goes to the Timo tribe again. It goes to the other two plaintiffs in this case. And, again, the question is asked, is there anything here of consequence, of significance to you? If there is, please let us know. The Timo tribe never respond to the July 28 letter. They never respond to the September 1 letter. Phone calls are made to the Timo tribe. They do not respond to that either. And so, again, if the point is, was a reasonable opportunity provided, I would say that the opportunities that were provided here, again, going back to the early 1990s for this same project area, the opportunities here absolutely, unqualifiably were reasonable. And if you compare the consultation that occurred here with the consultation which occurred in the Muckleshoot case, what occurred here in terms of interviews of tribal members and site visits and ethnographic studies, five ethnographic studies, we have far more here than what occurred in Muckleshoot. And, therefore, I would respectfully submit that the consultation here surpasses the test that the Ninth Circuit has identified for consultation. I also just want to point out that we're dealing with a situation here where BLM did not overlook anything significant. It just did not happen here. And the point is this. When BLM approved this project in October of 2004, there had been over three years of exploration in this precise area, the exact same area, same PCRI as within there, same tribe-designated TCP, exact same area. You've got the exploration ongoing, okay? So then you've got a situation where BLM announces to the public, we are considering allowing Cortez to explore for another five years, and we're going to consider allowing Cortez to increase the area of disturbance by 200 acres. What's the response? Timo tribe, they don't respond at all, don't respond at all. They didn't come back and say, wait a minute, you can't do this. They didn't come back and say that for the three years that had been going on, for the three years of exploration that had occurred, that the methods were desecrating any of the elements for which the PCRIs had been designated. They didn't come back and say that religious ceremonies had been disrupted. They didn't come back and say that the procedures weren't working and were causing all sorts of harm to this particular area. They were absolutely silent. They were silent. And the other two plaintiffs, likewise, they did not come back. They did not come back and say, hey, wait a minute, guys, you can't do this. Let me show you what your exploration has been doing here and the harm that it has been doing for these three years. We're not talking about three days. We're not talking about three months. We're talking about three years of exploration. The point is, if this was the problem, if this was the problem that the plaintiffs are saying this is, then something would have been said at the time when BLM went back to the tribe and the other two plaintiffs and said we're considering allowing this to go on further. Under any rule of reason which applies here, if this was having the impacts that the plaintiffs say this project is going to have, they would have said something. You're over your time, but would you – can you address briefly the cumulative impacts argument? Sure. When you're dealing with – I don't want to interrupt your – No, no, you're fine. I anticipated it. When you're dealing with cumulative impacts, you're dealing with two issues here, okay? And I realize you're referring to the test in the Great Basin Mine Watch versus Hank in the Klamath-Siskiyou case, but there are two issues here. And one of them was identified in the Churchill County case, and that is usefulness. Is the – was the work that was done, was the evaluation that was done useful to the decision maker? And what that means is was sufficient information provided to allow the decision maker to determine whether any changes needed to be made in the exploration project that was on the table at the time? That's the project that's on the table. It's the exploration project. We're not talking about Cortez Hills. We're talking about the exploration project. Was the analysis that was done useful? And I would submit – Cortez would submit that the analysis that was done was, in fact, useful. The plaintiffs come back and say, no, no, no, it wasn't useful. You had to do this full-blown analysis of Cortez Hills. It doesn't make sense. They identify two reasons why they say the analysis that was done was not useful and that more needed to be done. Number one, they say groundwater dewatering, okay? They're – that Cortez Hills is going to involve this massive amount of dewatering. And as a result, there was a requirement to analyze dewatering as part of this environmental assessment on the exploration project. Well, again, the test is usefulness. How would an analysis of groundwater dewatering and groundwater impacts affect in any way the decision that needs to be made on the exploration project? It would not. It would not be useful. It would be unnecessary to that project and, therefore, it would not be useful and, therefore, that argument does not hold up. Secondly, they come back – they say, okay, impacts on Native American resources. You had to study Cortez Hills because of Native American resources. Well, given the stipulations that have been put in place here by BLM and given the total lack of any identification of problems in terms of what has occurred before, I would submit there is no evidence in the record that there is going to be the cumulative impacts that the plaintiffs allege, and they failed to identify how more analysis on Cortez Hills was going to assist the decision maker in terms of the project that was on the table, which is the exploration. Okay, secondly, the second element that we're dealing here with, and this is what comes out of the EPIC decision that I believe, Judge Thomas, you were on the panel for that, is practicality. Sure, there was a plan of operation submitted in January of 2001 for the Petermann Project, but after that time, there was the discovery of Cortez Hills, and as a result of the discovery of Cortez Hills, the plan of operations that BLM had been processing for Petermann was withdrawn. It was suspended because everybody knew that a new plan of operations was going to have to be submitted for the Cortez Hills Project. That plan of operations did not exist at the time that the environmental assessment was prepared for this project, for the amendment, the amendment, the exploration that was approved in October of 2004. The plan of operations for the Petermann Project in Cortez Hills did not get submitted until August of 2009, 2005. Therefore, the details of the project were simply not known at the time. The draft environmental impact statement for Cortez Hills first came out, I believe it was in September of 2007, and the final EIS was eventually released in October of 2008. It took over three years for BLM to eventually put together this environmental impact statement on Cortez Hills. So the bottom line is it's an issue of practicality. In the Epic case, you were dealing with those two timber sales, and one of the timber sales was proposed, and what this court found was the Forest Service had no obligation to analyze at all, at all, that second timber sale because the details of the project were not known at the time. They were not known. And then the court, this court went on to say, but even if there was some obligation to study that second timber sale, even if there was, the general response that was given in a comment letter was adequate. That's what we're dealing here, with here. The details of the project were simply not known. They did not exist, and BLM had no obligation to conduct any kind of hypothetical speculative cumulative effects analysis for a project where the details were not known. Again, the plan of operations did not get submitted until August of 2005. So we're talking about April, May, June, July, August, five months after State Director Abbey issued his decision in this case. So there was no obligation to engage in any kind of speculative analysis as explained in the Headwaters case and in other cases that this court has decided. So it's that two, those two prongs there. It's usefulness and it's practicality. BLM is not required to do the impractical. Counsel, now you've gone a little bit beyond. But I think, I hope you've had an opportunity to make the arguments you want to make, because it's an important case and we don't want to cut you off. Let me just ask one last question, Justice Thomas. Just a practical question to follow up on your practicality. I gather that exploratory drilling is underway. Exploratory drilling is underway. And there was no injunction or anything in this case. No injunction was requested. No preliminary injunction was requested. So the exploratory program authorized 200 acres of additional disturbance. Of that 200 acres of disturbance that were authorized, there have been in the four years 35 acres of disturbance. So there are 165 acres left. So the project is still very much alive and, I might add, is of utmost importance to Cortez Gold Mines.  Thank you. You're welcome. Thank you. That's useful. Useful. And practical. And practical. Thank you, Your Honor, and thank you for the extra time. I'll go back on some of the points. You know, it seems when you look at this that it's the public's burden or the tribe's burden to come up and analyze all of these impacts and provide all this information. We think, you know, the Carmel-by-the-Sea case and many others say it's the government's job to consult. It's the government's job. Counsel, what about the argument he makes that there was a significant consultation in 92, significant consultation in 97, significant consultation again in 2000 and 2001? Right. And he talked about this. There was consultation 10, 15 years ago on this precise area. The precise area is 50 square miles. There, like I said earlier, there was exploration going on over these years. There were some mining projects. And if you go to our reply brief, we actually had asked BLM to, the plaintiffs did not complain about anything. Between the EA being issued in September 1st, and there was no draft, they just went to the final right away. We had no opportunity on that, on consultation. We asked for, after the EA came out, please show us some maps. We want to respond. The Western Shoshone Defense Project is a nonprofit group made up of mostly tribal elders that work, members of the Tamok tribe that work very closely with the leadership of the Tamok tribe, and they are in constant communication. And the Western Shoshone Defense Project asked BLM, please show us the maps. We want to respond. You're asking for us for specifics. Please give us some specifics. No. Two days later, the project's approved. That's not reasonable opportunity when people ask for information. And it is, frankly, refused. You know, I didn't hear in a half an hour of discussion why they couldn't give the public and the tribe the location of a single drill rig. And I didn't say that there were 375 all at once, but think of six or seven drill rigs trying to conduct argument, let alone religious ceremonies, if there were six or seven or even just one in the back of the room. It's pretty destructive. So I think the consultation, I think under Pitt River and the other cases, just the fact that there was some consultation on some projects that happened to be over there satisfies, you know, a few hundred acres over there satisfies consultation duties on 50 square miles. Think of, you know, that chair compared to the entire room here. I don't think that consultation on previous projects cuts the mustard here under Ninth Circuit case law. So, again, no answer as to why we never got any information despite our requests. Regarding the cumulative impacts on the usefulness, it's surprising for Cortez to come up here and say BLM never knew any details, did not know about the Cortez Hills project or the Peterman project. The record speaks for itself. The record says, as Ms. Fitzgerald admits, it was a reasonably foreseeable future action. We just can't waive it because Cortez was in the process of revising it. The 2004 ethnographic report was reviewing the Cortez Hills project and the impact of Western Shoshone while, according to Mr. Tuckman, no one knew anything about the Cortez Hills project. It was speculative. Again, it would have been speculative if there was no reasonably foreseeable action. BLM admits here that it was a reasonably foreseeable action. That's the test. It's right in the same area. So we think it certainly would have been useful and practical. Think of the argument. It wouldn't have been useful to know the impacts from a 7,000-acre mine, one of the country's largest open-pit gold mines. It would not be useful to know the impacts on religious uses when combined with five years of exploration in the same area. I think it would be incredibly useful. And we didn't make a big deal of the watering. These are Western Shoshone uses that are being impacted. We didn't show that there were no impact. Look at the record. The record shows, in fact, that the ethnographic report we cite in our reply brief at page 4 saying that the use of the top of Mount Denimbo, for example, for prayer and meditation may have been reduced due to recent mining activities. And we cite some other evidence from BLM's own documents that show that exploration is having an impact. So to say there's no impact, and then there will be no impact when we have another 7,000 acres of a hugely destructive mine right in the same area, to say that, well, we wouldn't have changed our decision. It's essentially what I'm hearing this morning. And that's not BLM's job. BLM's job is to take all the evidence, consult with the tribes. So the fact that there was some consultation done on some of these old projects 10, 15 years ago, I think the law is very clear. We have to do that now, and I think it's BLM's duty to do that. And I wanted to thank the Court. I know there's a lot of complicated issues in this case, and I wanted to thank you for the opportunity to present the interests of my tribal clients. Thank you very much. Thank you. The case you heard will be submitted, and although we will decide the legal questions, there's no reason you can't consult with each other now on an ongoing basis. You're drilling. You're all here today. Maybe you can work something out in terms of going forward because you're two neighbors that have to live together for a long time, apparently so. It won't affect our decision one way or the other, but to the extent that you can start working cooperatively on some of these things now, I think it would behoove you to have a cup of coffee and perhaps chat about things after the hearing. So that's just my word of wisdom for the day. It won't affect our decision one bit because we're presented with discrete legal issues and we will decide the court. Thank you very much.
judges: Thomas, Paez, Ezra